**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of:<br><br>L.A.T. | DIVISION ONE<br><br>No. 85036-9-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — L.A.T. appeals from a King County Superior Court order committing him to 14 days of involuntary mental health treatment. He contends that sufficient evidence does not support any of the trial court's bases for commitment. Because L.A.T. has not established an entitlement to relief, we affirm.

I

L.A.T. lives in an apartment above a barn on his parents' property in Snohomish, Washington.[1] In late January or early February 2023, L.A.T.'s father, R.T., took him to the emergency room at Evergreen Hospital in Kirkland after he found L.A.T. hiding behind the couch and saying that he could see, hear, or feel people in the yard. After six hours at the facility, L.A.T. walked out of the emergency room because he believed the doctors and nurses were talking about him and that a brain scan conducted at the hospital "did something to his head."

---

[1] At the time of the hearing, L.A.T. was 39 years old.

R.T. could not find L.A.T. until he showed up at his parents' property the following day.

At some point thereafter, R.T. dropped L.A.T. off at Northpoint rehabilitation facility. After "about 12 hours," L.A.T. walked out of the facility to a bus stop approximately a mile away because "they were marching people across the roof" and he believed someone had handed him a post-it note that read "you will die in your sleep tonight." R.T. brought L.A.T. back to the facility to be readmitted. L.A.T. left the facility again the following day and walked two and a half miles to R.T.'s workplace, in the cold and rain, dressed only in a t-shirt and jeans.

The following day, R.T. took L.A.T. to the emergency room at EvergreenHealth Monroe. L.A.T. was experiencing substance withdrawals and abdominal cramps. L.A.T. walked out of the facility before he could be treated and walked home to his above-barn apartment. L.A.T. had left his apartment keys at the hospital. R.T. offered to get spare keys from his wife, but before he could do so, L.A.T. started "shaking the doors as violently as possible." L.A.T. then retrieved a pipe from the barn and started pounding on the door. Once he realized he could not break through the door, L.A.T. used the pipe to break the door's window.

L.A.T. was brought to EvergreenHealth Monroe by law enforcement on February 4, 2023. On February 7, 2023, L.A.T. was transferred to Fairfax Hospital in King County. When L.A.T. arrived at Fairfax, he was "irritable, paranoid, delusional" and "rapid of speech." L.A.T. denied that he was

experiencing any paranoia or delusions and maintained that the hospital was giving him placebos. L.A.T. expressed that he had driven his car through a stop sign at 80 miles per hour because there was someone with a gun in his car and snipers in the trees. L.A.T.'s treating provider, Anita Vallee, diagnosed him with unspecified psychosis and severe stimulant use.

Hospital staff filed a petition for 14-day involuntary treatment pursuant to RCW 71.05.230. A hearing was conducted on February 21, 2023. R.T. and Vallee both testified at the hearing, as did L.A.T. himself. Following the hearing, the trial court entered written findings of fact and conclusions of law, which incorporated its oral findings and conclusions.

In reaching its decision, the court relied primarily upon the testimony of R.T. and Vallee, both of whom the trial court found to be credible. Based on their testimony, the trial court found that, as the result of a behavioral health disorder, L.A.T. presented a likelihood of serious harm to the property of others. The court found that there was "recent and reliable evidence" that L.A.T. crashed through a fence while hallucinating, broke a window and door to his apartment while hallucinating and delusional, and drilled holes in the walls of his apartment while under a delusion that there was a cat inside.

The trial court also found that L.A.T. was gravely disabled under either statutory definition of the term. First, the trial court found that L.A.T. was unable to provide for his medical needs because he had walked out of three hospitals due to a delusion that someone at the hospital was out to get him. The trial court also found that L.A.T. had not been sleeping due to a fear of dying in his sleep.

3

The trial court found that although the hallucinations and delusions may have been exacerbated due to L.A.T.'s drug use, they could not be attributable solely to substance abuse, as L.A.T. was continuing to experience them after any illicit substances had been metabolized.

Second, the trial court found that there was evidence that L.A.T. had exhibited severe deterioration over the previous six months. The trial court compared R.T.'s testimony about L.A.T. engaging, working, and expressing linear, coherent, reality-based thoughts in July 2022 with his recent behavior of yelling, screaming, thinking people are out to get him, and seeing people in the fields and under the floorboards of his car.

The trial court further found that treatment in a less restrictive alternative is not in the best interest of L.A.T. or others. The trial court noted that L.A.T. was not mentally stable and denied the need for treatment, "which does not bode well for compliance with a less restrictive treatment order at this time." Thus, the court ordered that L.A.T. be detained for 14 days, starting on February 20, 2023.

L.A.T. appeals.

II

L.A.T. contends that the superior court erred by committing him to 14 days of involuntary mental health treatment. This is so, L.A.T. avers, because the superior court's order is premised on the findings that he was gravely disabled and presented a likelihood of serious harm to the property of others, and that these findings are not supported by substantial evidence in the record. We disagree.

4

"When a trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (citing In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999). We "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence." LaBelle, 107 Wn.2d at 209. "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978). "The substantial evidence standard is deferential and requires the appellate court to view all evidence and inferences in the light most favorable to the prevailing party." Lewis v. Dep't of Licensing, 157 Wn.2d 446, 468, 139 P.3d 1078 (2006). We treat unchallenged findings as verities on appeal. State v. Stenson, 132 Wn.2d 668, 697, 940 P.2d 1239 (1997).

To commit a person for up to 14 days of involuntary mental health treatment, the State must prove, by a preponderance of the evidence, that the person is gravely disabled or presents a likelihood of serious harm. RCW 71.05.240(4)(a). A person can be gravely disabled in one of two ways. First, a person is gravely disabled if, as the result of a behavioral health disorder, he or she is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." Former RCW 71.05.020(24)(a) (2021). Second, a person is gravely disabled if, as the result of

5

a behavioral health disorder, he or she "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." Former RCW 71.05.020(24)(b). Here, the trial court found that L.A.T. was gravely disabled under both definitions and that he presented a likelihood of substantial harm to the property of others.

A

L.A.T. asserts that there was not sufficient evidence to support the finding that he was "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety."[2] This is so, he asserts, because he was able to provide his own food, clothing, and shelter and that his physical pain is not evidence that he was unable to care for his medical needs. We disagree.

In order to establish that the person is in danger of serious physical harm, "the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05. However, there is no requirement that the State show that the danger is imminent. LaBelle, 107 Wn.2d at 203.

---

[2] We note that L.A.T. did not assign error to any of the trial court's findings of fact. We therefore treat all factual findings as verities on appeal. Stenson, 132 Wn.2d at 697.

L.A.T. argues that "[t]he court believed the physical pain and suffering that led him to go to the ER was evidence [L.A.T.] was unable to actually take care of his medical needs." Br. of Appellant at 12. This argument mischaracterizes the trial court's findings. In its oral ruling, the trial court noted that L.A.T. was in significant physical pain, yet he walked out of the hospital without having the pain treated. The trial court also emphasized L.A.T.'s habit of leaving medical facilities in its written findings of fact:

> The court cannot ignore that he walked out of three hospital facilities in the last two months, while receiving medical care. The Respondent left the hospitals in a state of abject terror due to his hallucinations or delusions that someone [was] out to get him and he could not stay in the hospital as a result.

This finding was supported by the testimony of R.T., who described four recent instances when L.A.T. walked out of a medical facility despite the need for treatment. The first time that L.A.T. walked out of the emergency room, he did so because he believed the doctors and nurses were talking about him and that the brain scan conducted by hospital staff to check for tumors "did something to his head." L.A.T. also walked out of a rehabilitation facility twice in a 24-hour period because he believed people were stomping on the roof and that someone told him he would die in his sleep.

The trial court's finding that L.A.T. could not take care of his medical needs is also supported by the testimony of L.A.T. himself. L.A.T. testified that he did not believe he had any mental health condition. Although he testified that he would take medication if prescribed, he did not believe that he was currently

7

on any medication.  However, L.A.T. had been prescribed and was taking Zyprexa while at Fairfax.

The trial court's conclusion that L.A.T. is gravely disabled under former RCW 71.05.020(24)(a) is supported by substantial evidence.

B

L.A.T. also asserts that there was not sufficient evidence to support the finding that he "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his actions and is not receiving such care as is essential for his health or safety."  This is so, he asserts, because the trial court relied on his recent increase in drug usage rather than on a behavioral health disorder.  This argument is belied by the record.

Under the second definition of gravely disabled, the State must prove a recent and significant loss of cognitive or volitional control.  LaBelle, 107 Wn.2d at 208.  "Implicit in this definition is that the individual is unable, because of a severe deterioration in mental functioning, to make rational choices regarding treatment."  In re Det. of A.F., 20 Wn. App. 2d 115, 127, 498 P.3d 1006 (2021) (citing LaBelle, 107 Wn.2d at 208), review denied, 199 Wn.2d 1009 (2022).

In an unchallenged finding of fact, the trial court found that R.T. testified credibly that

> in June or July 2022, [L.A.T.] was engaging, working in his shop
> and that he was fun to be around.  His father testified that he could
> have linear, coherent and reality based conversation with him.
> However, now [L.A.T.] is angry, frightened, yelling, screaming,
> thinks people are after him, sees people in the fields, and in the
> back of his vehicle or under the floorboards of the car.

An additional unchallenged finding of fact states that "[w]hile some of the hallucinations and delusions may have been enhanced because of his drug use, he is still experiencing them now while in the hospital and he has metabolized all illicit substances." Thus, the trial court did not improperly rely on L.A.T.'s use of illicit drugs and its finding that L.A.T. had manifested severe deterioration in routine functioning, as the result of a behavioral health disorder, is supported by the evidence.

Substantial evidence also supports the trial court's finding that the deterioration in L.A.T.'s condition rendered him unable to care for his health and safety. In an unchallenged finding of fact, the trial court found that L.A.T. "denies the need for mental health treatment." As discussed supra, the trial court found that L.A.T. had walked out of a health care facility on multiple occasions due to his delusional beliefs. Vallee testified that L.A.T. had poor insight into his condition, something that L.A.T. exhibited at the hearing when he testified that he did not believe that he had a mental health condition. At the hearing, L.A.T. continued to express his belief that his delusions were real, including the delusion that people had been standing in his family's pasture for the past six months. Further, while L.A.T. indicated that he would be willing to take medication, he believed that he was currently only receiving placebos.

The trial court's conclusion that L.A.T. is gravely disabled under former RCW 71.05.020(24)(b) is supported by substantial evidence.

C

As a third basis for its detention order, the trial court concluded that L.A.T. presented a likelihood of serious harm to the property of others, as the result of a behavioral health condition. L.A.T. contends that this conclusion was not supported by substantial evidence. This is so, he asserts, because sufficient evidence does not support a finding that he crashed into a fence at 80 miles per hour and that the remaining evidence all pertains to L.A.T.'s own property. We disagree.

To prove that a person is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety," the State must demonstrate a substantial risk of danger as evidenced by a recent overt act. In re Harris, 98 Wn.2d 276, 284, 654 P.2d 109 (1982). The State need not show the danger to be imminent. Harris, 98 Wn.2d at 283.

L.A.T. first asserts that the evidence presented does not support a finding that he drove his vehicle into a fence at 80 miles per hour. This is a mischaracterization of the trial court's finding of fact. The trial court's actual finding of fact states that "during a time when he was hallucinating or was delusional the Respondent crashed through a fence at a high rate of speed." This is supported by the testimony of R.T., who observed damage to L.A.T.'s vehicle, which L.A.T. informed him was the result of driving through a friend's gate. Vallee also testified that L.A.T. reported that he had been driving at 80 miles per hour because he believed there were snipers in the trees.

However, even if we accepted L.A.T.'s argument that the finding was not supported by the evidence, the remaining evidence would still support the trial court's finding that L.A.T. presented a likelihood of serious harm to the property of others, as the result of a behavioral health condition. In its unchallenged findings, the trial court found that L.A.T. "broke a window of his apartment door and damaged the door itself while hallucinating and delusional. He also drilled holes in the wall of the apartment, believing a cat was inside." L.A.T. asserts that the walls and door of his apartment were his property by virtue of belonging to his father. L.A.T. cites no authority for this proposition. We need not consider arguments that are unsupported by meaningful analysis or authority. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, the trial court's conclusion that L.A.T. is gravely disabled under former RCW 71.05.020(24)(b) is supported by substantial evidence.

Substantial evidence supports the trial court's findings that L.A.T. was gravely disabled and that he presented a serious risk of harm to the property of others. These findings support the trial court's commitment order. Therefore, L.A.T. has not established an entitlement to relief.

Affirmed.

Dwyer, J.

WE CONCUR:

Cohen, J.                Mann, J.